UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELINA PAPIA,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF MARIN, et al.,<br><br>    Defendants. | Case No. 24-cv-06769-JSC<br><br>**ORDER RE: DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 30 |

Plaintiff sues the County of Marin (the "County"), the Marin County Sheriff's Office (the "Sheriff's Office"), the County of Marin Department of Health and Human Services ("Marin HHS"), and Sheriff Jamie Scardina ("Sheriff Scardina") for civil rights violations against her son, Mr. Dylan Baylacq ("Dylan"), while detained at the Marin County Jail (the "Jail"). (Dkt. No. 29.)[1] Defendants now seek to dismiss all federal causes of action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and all state law claims because Defendants are immune from suit under California law. (Dkt. No. 17.) After careful consideration of the parties' briefing, and having had the benefit of oral argument on June 12, 2025, the Court GRANTS in part and DENIES in part Defendants' motion.

**BACKGROUND**

**I.    Second Amended Complaint ("SAC") Allegations**

Plaintiff is Dylan's mother. (Dkt. No. 29 ¶ 11.) She "sought guidance from the County of Marin Youth and Family Services" since Dylan was very young and when he was 15, Plaintiff "sought mental health guidance and assistance for [him] from Marin County Mental Health." (*Id.*

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

¶ 24.) "County health staff charted that Dylan exhibited symptoms of ADHD when he was a young child and that his symptoms had gotten worse" as he aged. (*Id.*)

"On December 22, 2022, Dylan, then age 20, was taken into custody at the Marin County Jail." (*Id.* ¶ 25.) Jail records document "he was observed by jail staff to have multiple blisters and lesions on his hands from self-harm." (*Id.*) During this period, he "signed a Release of Information permitting jail staff to contact his mother, Plaintiff," and this release was effective through Dylan's death. (*Id.*)

"On January 2, 2023, Dylan was placed on a Welfare and Institutions section 5150 involuntary hold by the Marin County Sheriff." (*Id.* ¶ 26.) Plaintiff reported "she was worried about Dylan's increase in self-harm and self-destructive behaviors after Dylan told his mother that he was going to cut a tattoo out of his body." (*Id.*) Approximately 20 days later, Dylan was booked into Marin County Jail for the alleged "arson of an inhabited structure." (*Id.*) According to the probable cause statement for his arrest, Dylan had "claimed there was a 'ghost' in the house and that 'the house needs to burn.'" (*Id.*) And on March 23, 2023, while still at Marin County Jail, Dylan was observed by jail staff as "up all night pacing and mumbling under his breath." (*Id.* ¶ 27.) Dylan's cellmate requested a move away from his cell due to this behavior. (*Id.*) Accordingly, Dylan was "reclassified to Mental Health Level 4 (highest level) and moved into special (segregated) housing" which required, under the County's rules, that he receive safety checks at least once every 60 minutes or more frequently if necessary. (*Id.*) On April 4, 2023, Jail mental health staff interviewed Dylan who "informed them that he had been hospitalized for mental illness." (*Id.*)

Dylan was later released, but on June 17, 2023, he was "again taken in protective custody by the Marin County Sheriff pursuant to Welfare and Institutions Code section 5150." (*Id.* ¶ 28.) He was released after 24 hours but transported to the Jail for an alleged probation violation. (*Id.*) Jail mental health staff interviewed Dylan again on June 18, 2023 and "Jail staff again observed scabbed, round burn sores on Dylan's left inner arm. When he was asked about them, Dylan admitted that he intentionally burned himself." (*Id.*) Ten days later, Dylan "was admitted to Sutter CPMC Bernal Mission Hospital in San Francisco for a drug overdose." (*Id.* ¶ 29.) Dylan

was held there until July 6, 2023, and the "discharge note stated Dylan was admitted to the hospital for a drug overdose and suspected suicide attempt and that he was placed on a psychiatric hold for treatment by the psychiatry team." (*Id.*) After his release, Dylan was booked three more times into the Jail on July 12, 2023, August 15, 2023, and August 27, 2023. (*Id.* ¶¶ 30-31.) On the third of these detentions, Dylan was again classified as "Mental Health 4," and jail staff notes indicated:

> he had a history of being "needy, constantly hitting intercom," bizarre behavior, pacing in his cell, talking to himself, not getting along with other incarcerated persons, yelling profanities at custody, screaming all night, disrupting the pod, oppositional, demanding, hostile. placed on water restriction due to behavior and "lack of impulse control."

(*Id.* ¶ 31.) Despite this observed behavior, the same notes state Dylan had "no history of 'inpatient psych hospitalizations.' 'No acute mental health concerns[.]'" (*Id.*) Dylan was "improperly placed alone in a cell designed for two occupants and confined for 23 hours per day with one hour of solitary exercise time per day," and through September 28, 2023, he was not examined by mental health staff. (*Id.* ¶ 33.) Staff only checked on him for the minimum of once every hour and he was provided "a nylon mesh laundry bag in spite of his mental health classification and the symptoms he exhibited." (*Id.*) Jail staff did not contact Plaintiff for more information or "request Dylan's consent to obtain his medical/mental health records or make any other reasonable efforts to obtain information and records relating to Dylan's previous health care professionals as required under the Marin County Sheriff's Custody Manual 723.3." (*Id.* ¶ 32.)

Around September 13, 2023, Dylan's father "reported to the Marin County Probation Department that he was worried that his son could attempt to kill himself," but on September 28, 2023, Dylan was reclassified to "Mental Health 3," a lower classification. (*Id.* ¶ 34.) Staff did not conduct safety checks at necessary intervals once he was reclassified. (*Id.*) Two days later, on October 1, 2023, Dylan "was observed on his side on the floor next to the bunks in his cell. After his cell door was unlocked, he was found to be unresponsive and without a pulse." (*Id.* ¶ 35.) A subsequent investigation revealed Dylan "had hung himself with the jail[-]issued nylon mesh laundry bag looped through a pre-manufactured hole in the upper bunk as a ligature." (*Id.*)

Dylan's cell—Special Housing Pod-cell 17—was "furnished with an upper bunk that had

1  pre-existing, manufactured hole(s) in the platform that provided a tie-off point for
2  hanging/strangulation." (*Id.* ¶ 37.) Further, there were "multiple prior suicide hangings at the
3  Marin County Jail, and other events, which put defendants on notice of the dangerous conditions
4  at the jail," including a hanging death by the same means in the same cell just ten years prior. (*Id.*
5  ¶¶ 38, 38c.) On May 23, 2023, just months prior to Dylan's death, "the Bureau of State and
6  Community Corrections directly notified the County of Marin, Sheriff Scardina and the Marin
7  County Sheriff's Office that Marin County Jail contained 'ligature point hazards in each cell[.]'"
8  (*Id.* ¶ 38e.) A year later, in June 2024, a Grand Jury Report found the County and Sheriff Scardina
9  "failed to reasonably review, investigate and report" cell hangings at the Jail since at least 2008.
10  (*Id.* ¶ 38a.)

11  Dylan's death resulted from "Defendants' longstanding and pervasive mental health and
12  custodial customs, practices and policies of deliberate indifference in failing to protect inmates at
13  the Marin County Jail." (*Id.* ¶ 5.) Namely:

14  (1) "improper classification of inmates suffering from acute mental illness";

15  (2) "failure to conduct safety checks on such inmates at reasonable intervals";

16  (3) "failure to provide mental health care to inmates";

17  (4) "placing incarcerated individuals in cells which have known, patently dangerous and
18  defective ligature tie-off points which placed them at a substantial risk of suffering serious bodily
19  injury or death";

20  (5) "failing to take reasonable actions to investigate these conditions which existed in
21  every cell at the Marin County Jail for many years";

22  (6) "indiscriminately providing ligature materials to special management inmates who are
23  confined to these cells despite the self-evident risk in doing so"; and

24  (7) "failing to take reasonable available measures to repair, correct or abate these risks."
25  (*Id.* ¶¶ 5-6.)

26  **II.    Procedural Background**

27  Plaintiff brings (1) a Section 1983 claim for failure to protect from harm against all
28  Defendants; (2) a Section 1983 claim for deliberate indifference to serious medical and mental

4

health needs against all Defendants; (3) a *Monell* claim for unconstitutional policies and practices against the County; (4) a Section 1983 claim for supervisory liability against Defendant Sheriff Scardina; (5) a Section 1983 claim for interference with familial association against all Defendants; (6) California negligence claim against Sheriff Scardina; (7) California Civil Code § 52.1 claim against all Defendants; and (8) California wrongful death claim against all Defendants. (Dkt. No. 29.)[2]

After filing her original complaint, Plaintiff amended and Defendants then successfully moved to dismiss all claims. (Dkt. Nos. 5, 27.) Plaintiff subsequently filed her SAC and Defendants now move to dismiss the SAC in its entirety under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 30.)[3] Although the SAC appears to make four *Monell* claims, the Court understand she asserts two theories of *Monell* liability, both on Dylan's behalf and for injury to Plaintiff: (1) that the County had a pervasive custom or practice of placing individuals in cells the County knew posed a suicide hazard, and (2) that the County failed to properly train its staff to recognize when an individual was a suicide risk.

## ANALYSIS[4]

### I.      Proper Defendant

Defendants argue the SAC improperly sued the Sheriff's Office and Marin HHS which are both subsumed by the County. (Dkt. No. 30 at 2.) At oral argument Plaintiff agreed the County is the only proper defendant on the *Monell* claims. Accordingly, the Court addresses *Monell* liability as to the County alone and dismisses the Sheriff's Office and Marin HHS as defendants.

### II.      *Monell* Claims

The Court must accept all plausibly alleged factual allegations as true but "[t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements, do not suffice."

---

[2] Dylan's father, Anthony Baylacq is a named Defendant in this action pursuant to California Code of Civil Procedure § 382. (Dkt. No. 5 ¶ 8; Cal. Civ. Code Proc § 382 ("If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint …").)

[3] Plaintiff's brief fails to comply with Northern District Local Rule 3-4(c)(2). While the Court considers her opposition, the parties must be familiar with and comply with the Local Rules and the Court's Standing Order.

[4] Neither party disputes the other's request for judicial notice so the Court grants the requests.

5

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993) (holding Rule 8 notice pleading requirements apply to *Monell* claims). A claim for municipal liability under Section 1983, known as a "*Monell*" claim, requires proof: (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a policy; (3) this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy is the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). So, a plaintiff must plead the violation of their constitutional rights was the result of "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 693-95 (1978)). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

Plaintiff adequately alleges the County had a practice of placing individuals in cells that posed suicide risk and that the County acted with "'deliberate indifference to the constitutional rights of [the Jail's] inhabitants.'" *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

The SAC supports a plausible inference the County was put on notice of Dylan's risk of suicide by his own past history at the same Jail, his father's call to probation only weeks before Dylan died, and Jail staff's observations of Dylan. In early January 2023, Dylan was placed on a 5150 hold by the County Sheriff, and then, only 20 days later, was booked at the Jail for arson when he claimed "there was a 'ghost' in the house and that 'the house needs to burn.'" (Dkt. No. 29 ¶ 26.) In April 2023 Dylan informed Jail staff he had previously been hospitalized for mental illness. (*Id.* ¶ 27.) In June 2023 he was again placed on a 5150 hold and released after 24 hours, but transported to the Jail for an alleged probation violation. (*Id.* ¶ 28.) During this detention, only three months prior to his death and 24 hours after his section 5150 hospitalization, Jail staff

observed "scabbed, round burn sores on Dylan's left inner arm. When he was asked about them, Dylan admitted that he intentionally burned himself." (*Id.*) Ten days later he was admitted to Sutter Hospital; the July discharge notes stated he "was admitted to the hospital for a drug overdose and suspected suicide attempt and that he was placed on a psychiatric hold for treatment by the psychiatry team." (*Id.* ¶ 29.) Dylan was booked three more times in July and August, (*id.* ¶¶ 30-31) and on August 27, 2023, a month prior to his death, Dylan was reported by Jail staff as follows:

> he had a history of being "needy, constantly hitting intercom," bizarre behavior, pacing in his cell, talking to himself, not getting along with other incarcerated persons, yelling profanities at custody, screaming all night, disrupting the pod, oppositional, demanding, hostile. placed on water restriction due to behavior and "lack of impulse control."

(*Id.* ¶ 31.) Drawing all reasonable inferences in Plaintiff's favor, these allegations support an inference the Jail was put on notice that Dylan was a suicide risk.

The SAC also supports a plausible inference the County knew the Jail posed a risk to suicidal inmates. A June 28, 2024 grand jury report disclosed the County was aware of multiple in-cell hangings occurring since at least 2008, and subsequently "failed to take reasonable available measures to abate, correct or repair the dangerous tie-off conditions in the jail in spite of the obvious risk of death" posed by these conditions. (*Id.* ¶ 38a 38b-d, 38f.) And a May 23, 2023 Bureau of State and Community Corrections communication informed the County of "ligature point hazards in each cell" mere months prior to Dylan's own death through these means. (*Id.* ¶ 38e.) Despite this knowledge, the County placed Dylan in a cell with a known ligature-point that allowed him to commit suicide. Indeed, Plaintiff alleges the County was aware that in 2013 an inmate had "hung himself through holes in the upper bunk in cell 17, the same cell where Dylan Baylacq subsequently hung himself." (*Id.* ¶ 38c.) And in August of 2023, less than two months prior to Dylan's death, another inmate at the Jail also committed suicide via a ligature point in his cell. (*Id.* ¶ 38f.) Drawing all reasonable inferences in Plaintiff's favor, as the Court must, Plaintiff plausibly pleads that the County had a pervasive custom or practice of placing individuals in cells the County knew posed a suicide hazard.

The County's argument that the cell complied with several building code regulations

misses the mark because "the design of the cell is only the backdrop for the entity defendants' policy or custom." *Castro*, 833 F.3d at 1075.  The County's maintenance of a cell with multiple ligature points supports an inference "the County made deliberate choices *in light of* the poor design […] of the [] cell." *Id.*  Further, the allegations support an inference the County's failure to change the cell's condition caused Dylan's injury because if the ligature points were removed, his death "could have been averted." *Id.* at 1075-76.

The County also argues the Bureau of State and Community Corrections report finding the Jail had a number of ligature points is inapposite because the Bureau report also stated "Suicide hazard minimum requirements went into effect in 1994.  The jail falls under 1988 standards and therefore it [*sic*] not required to remediate suicide hazards." (Dkt. No. 30-1 at 28.)  But the Bureau report also notes the Bureau provided "technical assistance" to Jail staff and that staff "requested examples of ligature point remediation from other agencies in an effort to forecast future remediation efforts." (*Id.*)  Regardless of which building standards applied to the Jail, drawing reasonable inferences in Plaintiff's favor, these allegations demonstrate notice of a suicide hazard of which the County was aware; indeed, that Jail staff "requested examples of ligature points" to "forecast future remediation efforts" demonstrates the County was aware of the danger of these ligature points.

So, drawing all reasonable inferences in Plaintiff's favor, Plaintiff has plausibly pled a *Monell* claim against the County.  While Plaintiff has additional theories of *Monell* liability, given he has plausibly pled at least one theory "it is not necessary to evaluate [Plaintiff's other] theor[ies] at this stage." *Quinto-Collins v. City of Antioch*, No. 21-cv-06094-VC, 2022 WL 18574, at *2 (N.D. Cal. Jan. 3, 2022) (citing *Dizon v. City of South San Francisco*, 18-cv-03733-JST, 2018 WL 5023354, *3-6 (N.D. Cal. Oct. 16, 2018)).

### III. Supervisory Liability Claim Against Sheriff Scardina

"A supervisory official may be held liable under § 1983 only 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Keates v. Koile*, 883 F.3d 1228, 1242-43 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)).

8

1    Therefore, allegations that a supervisor merely "knew or should have known" about alleged

2    constitutional violations are insufficient to state a claim against a supervisor. *See Lapachet v. Cal.*

3    *Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1194 (E.D. Cal. 2018) (citing *Farmer v. Brennan*,

4    511 U.S. 825, 837 (1994)). But "[e]ven if a supervisory official is not directly involved in the

5    allegedly unconstitutional conduct, '[a] supervisor can be liable in his individual capacity for his

6    own culpable action or inaction in the training, supervision, or control of his subordinates; for his

7    acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous

8    indifference to the rights of others.'" *Keates*, 883 F.3d at 1243 (quoting *Starr*, 652 F.3d at 1208

9    (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998))).

10   Here, Plaintiff does not allege Sheriff Scardina was personally involved in placing Dylan

11   in the allegedly dangerous cell or in failing to screen him; instead, she alleges Sheriff Scardina

12   was intimately involved in failing to train, supervise, or control his subordinates and acquiescing

13   to the constitutional deprivation. Specifically, the SAC alleges Sheriff Scardina "received and

14   personally reviewed" the Bureau of State and Community Corrections report about ligature points

15   and failed to redress the issue. (Dkt. No. 29 ¶ 14.) Plaintiff also alleges Sheriff Scardina failed to

16   "reasonably review, investigate and report" the grand jury findings about in-cell hangings which

17   issued only months prior to Dylan's death. (*Id.* ¶ 38a.) Drawing reasonable inferences in

18   Plaintiff's favor, Sheriff Scardina at least "acquiesce[d] in the constitutional deprivation […] that

19   shows a reckless or callous indifference to the rights of others." *Keates*, 883 F.3d at 1243 (cleaned

20   up).

21   Sheriff Scardina's arguments to the contrary are unavailing. He focuses on the Court's

22   prior order, when it held the first amended complaint failed to allege his personal involvement in

23   the actions leading up to Plaintiff's death. (Dkt. No. 27.) But unlike in the previously operative

24   complaint, the SAC alleges facts leading to a plausible inference that Sheriff Scardina acquiesced

25   to the constitutional deprivation, as he was repeatedly made aware of the cells' suicide hazards and

26   yet failed to take steps to remediate the same. This is especially so when, as alleged here, prior

27   deaths occurred in the same manner and even the same cell as Dylan. And one such death

28   occurred only one and a half months prior to Dylan's own hanging death. Further, Defendants

1  point to the Bureau of State and Community Corrections report where the Bureau indicated the
2  Jail was not required to reconfigure its cells as proof Sheriff Scardina was not deliberately
3  indifferent.  (Dkt. No. 30-1 at 28.)  But the report still indicated command staff sought to "forecast
4  future remediation efforts."  (*Id.*)  Sheriff Scardina was still aware, prior to Dylan's death, that
5  these conditions lead to multiple hanging deaths in the Jail and that the Jail had these issues.

   So, drawing all reasonable inferences in Plaintiff's favor, the SAC sufficiently pleads supervisory liability against Sheriff Scardina.

### IV.   Sovereign Immunity

"[U]nder California law, '"[a] public entity is not liable for an injury,' '[e]xcept as otherwise provided by statute."'" *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1200-01 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Jan. 29, 2016) (quoting *Eastburn v. Regional Fire Prot. Auth.*, 31 Cal.4th 1175 (quoting Cal. Gov. Code § 815(a))).  Under California Government Code § 844.6(a)(2), public entities are not liable for "[a]n injury to any prisoner."  *See e.g.*, *Towery v. California*, 14 Cal. App. 5th 226, 231-32 (2017).

The County seeks to dismiss the state law claims against it because it enjoys sovereign immunity as to these claims.  Plaintiff does not contest that state law claims against the County are barred by sovereign immunity, but instead notes § 844.6 "does not immunize individual public employees from liability for injuries legally caused by their 'negligent or wrongful act or omission.'"  (Dkt. No. 34 at 10 (quoting Cal. Gov't Code § 844.6).)  On reply, Defendants for the first time argue the claim against Sheriff Scardina is not properly pled because Plaintiff fails to adequately allege Sheriff Scardina owed a legal duty to him.  (Dkt. No. 35 at 9.)

Because Plaintiff does not contest the state law claims against the County are barred by sovereign immunity, these claims are DISMISSED.  And "the bar of sovereign immunity is absolute: no other court has the power to hear the case," so such dismissal is without leave to amend.  *Frigard v. United States*, 862 F.2d 201, 204 (9th Cir. 1988).  But the Court does not consider belated argument that the state law claims against Sheriff Scardina in his individual capacity are improperly pled.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.") (citing *Koerner v.*

*Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)).

## CONCLUSION

Thus, Defendants' motion to dismiss is DENIED in its entirety except as to the state law claims made against the County and all claims against the Sheriff's Office and Marin HHS; such claims are DISMISSED without leave to amend.

This Order disposes of Docket No. 30.

**IT IS SO ORDERED.**

Dated: June 16, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge

11